UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAPLE DRIVE FARMS FAMILY
LIMITED PARTNERSHIP, and
NICHOLAS H. SMITH,

        Plaintiffs,

                                          CASE NO. 1:11-CV-692

v.

                                          HON. ROBERT J. JONKER

TOM VILSACK, SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE,

        Defendant.
_____/

## OPINION

      This matter is before the Court on challenges by Plaintiffs to two administrative decisions of the Defendant Secretary. The first is the Secretary's decision that Plaintiffs converted a wetland on their farm, in violation of the Swampbuster provisions of the Food Security Act, as amended, 16 U.S.C. § 3801 *et seq.* The second is the Secretary's decision to declare Plaintiffs ineligible for certain federal program benefits because of their conversion of a wetland. Both decisions are subject to judicial review under the Administrative Procedures Act (the "APA"). The familiar standards of administrative review apply: namely, the Court must sustain the Secretary's decisions if they were the product of a rational decisional process based on substantial evidence in the administrative record. Plaintiffs have also raised two contract claims apart from APA review, one seeking damages, the other seeking injunctive relief. Both contract theories rest on the same premise: namely, that the Secretary's decisions – even if supported by rational decision-making and substantial evidence – breach an enforceable contract between Plaintiffs and the Secretary. After reviewing all matters of

record, and considering the parties' oral argument on the administrative review claims, the Court concludes that the Plaintiffs have not established any basis for judicial relief.

**Facts**

A.    *Background*

Plaintiff Maple Drive Farms Family Limited Partnership ("Maple Drive") owns farmland in Michigan, including without limitation the parcel of land (the "Parcel") at issue in this case. (Compl., docket # 1, at ¶ 2.)  The Parcel comprises approximately 2.24 acres within a field Maple Drive owns in Hillsdale County (the "Maple Drive Property").  (*Id.* at ¶¶ 1, 19.)  Plaintiffs describe the Parcel as a "localized depression surrounded by higher elevation land," with "bowl-like topography."  (*Id.* at ¶ 22.)  Plaintiffs note that the Parcel "tends to be wetter than adjacent lands."  (*Id.*)

Plaintiff Nicholas Smith is a general partner of Maple Drive.  (*Id.* at ¶ 3.)  Mr. Smith farms land Maple Drive and Smith family members own, primarily raising corn, soybeans, and wheat.  (*Id.* at ¶ 19.)  Mr. Smith has been farming for over 50 years.  (*Id.* at ¶ 20.)  In November 1961, Mr. Smith entered a Soil and Water Conservation Plan (the "Conservation Plan") with an agency then known as Soil Conservation Services ("SCS").   (FSA A.R., docket # 30, at 309-28.)[1]   Under the Conservation Plan, SCS assisted Mr. Smith with, among other things, the tile and drainage of certain areas of Smith family property in Hillsdale County, including the Parcel.  (*Id.*)  Mr. Smith, with cost-share funding from the agency now known as the FSA, installed drainage tile in the field containing

-----

[1]There are two separate certified Administrative Records in this case, reflecting the separate sub-agency actions Plaintiffs pursued.

the Parcel in 1964.[2]  (NRCS A.R. 117.)  The Parcel was drained and used to grow commodity crops at least through 1982.  (docket # 35 at 9.)   In the early 1980s, the drainage deteriorated.  (*Id.*)

SCS and its successor organization, the Natural Resources Conservation Services (the "NRCS") provided technical assistance to Mr. Smith in implementing the Conservation Plan over approximately two decades.  During that time, Plaintiffs did not have to comply with Highly Erodible Land ("HEL") and Wetland Conservation ("WC") provisions to receive USDA program benefits.  That changed with the Food Security Act of 1985, as amended, which conditioned eligibility for USDA programs on compliance with HEL and WC requirements.  16 U.S.C. §§ 3811, 3821.

B.    *Wetland Determinations*

On June 24, 1988, District Conservationist Dennis Haskins determined that a wetland existed on the Maple Drive Property, in the area of the Parcel.  (NRCS A.R. 213-214.)  On September 22, 1993, the District Conservationist again determined that a wetland existed on the Maple Drive Property, in the same area.  (*Id.* at 186, 382.)  Mr. Smith received notice of each of these determinations; he appealed neither of them.  Years passed.  Late in 2008, Mr. Smith executed a Form AD-1026, a "Highly Erodible Land Conservation and Wetland Conservation Certification," concerning the Maple Drive Property.  (*Id.* at 204.)  On the Form AD-1026, Mr. Smith  certified that he intended to "plant an agricultural commodity on land for which a highly erodible determination has not been made" and to "create new drainage systems, or conduct land leveling, filling, dredging, land clearing, or stump removal, that has not been evaluated by NRCS."  (*Id.*)  He authorized the NRCS to conduct a wetland determination on the Maple Drive Property.  (*Id.*)

_____

[2]The Agricultural Stabilization and Conservation Service ("ASCS") later became the FSA.

3

Jason Wheeler of the NRCS carried out the wetland determination. (*Id.* at 207.) In making the determination, Mr. Wheeler considered, without limitation, a soils map, and aerial images of the Maple Drive Property spanning 1979 through 2005. (*Id.* at 218-42.) On November 1, 2008, Mr. Smith received notice that the NRCS had determined preliminarily that the Parcel was a Wetland, and notice of his appeal rights. (*Id.* at 207-12.) On November 14, 2008, Mr. Smith appealed by requesting a reconsideration of the preliminary wetland determination and requesting mediation on the issue. (*Id.* at 245, 259.)

Mr. Wheeler visited the Maple Drive Property on November 4, 2008 and photographed the area, including the Parcel. (*Id.* at 243-44.) In response to Mr. Smith's request for reconsideration, the NRCS completed an on-site wetland investigation on November 25, 2008. (*Id.* at 246 -58.) In this on-site inspection, the NRCS identified two separate transect locations. (*Id.* at 116.) At the first transect point, the NRCS noted the existence of "normal circumstances . . . with no significant disturbances or potential problem," as well as "the conditions of a wetland: 1) hydrophytic vegetation, . . . 2) hydrology (water at 4 inches of depth and at soil surface within 15 feet of hand dug site), 3) hydric soils." (*Id.*) At the second transect point, the NRCS again noted normal circumstances with no significant disturbances or potential problems and found wetland conditions, including "1) hydrophytic vegetation . . . , 2) hydrology  3) hydric soils." (*Id.*) On December 12, 2008, NRCS concluded in light of the investigator's report that the Parcel was a Manipulated Wetland. (*Id.* at 257-58.)

Meanwhile, mediation between Mr. Smith and the NRCS continued. On January 28, 2009, Mr. Smith and the NRCS executed a Mediation Agreement. (*Id.* at 262.) The Mediation Agreement states, among other things, that Mr. Smith requests a wetlands delineation for the Maple Drive

Property; that NRCS agrees to provide the wetlands delineation and to provide advance notice to Mr. Smith of the time and date of the NRCS site visit so that Mr. Smith may attend; and that the Maple Drive Property "can be planted this spring as long as no trees are removed." (*Id.* at 262.) The Mediation Agreement also provides that mediation will remain open for sixty days after the delineation. (*Id.*) It is undisputed that NRCS, through a conversation Jason Wheeler had with Mr. Smith, later told Mr. Smith that he could cut trees down as long as the tree stumps remained in place. (*Id.* at 461.)

In May of 2009, Mr. Smith removed trunks and limbs of woody vegetation in the Parcel, leaving stumps in place. (docket # 35 at 12.) He also leveled a ditch in the northern part of the Parcel, an area sometimes referred to as the "northern neck" part of the Parcel. (*Id.*) He replaced and leveled spoils previously excavated from the northern neck area and planted the Parcel with corn. (*Id.*) It is undisputed that Mr. Smith leveled, filled, and planted the Parcel. According to Mr. Smith, he did not believe the northern neck was wetland. (*Id.*)

On March 23, 2009, the NRCS notified Mr. Smith that it planned to conduct the on-site wetland delineation on April 7, 2009, and that the State Soil Scientist, State Biologist, District Conservationist, and Michigan's NRCS State Appeals Coordinator would all participate. (NRCS A.R. at 264.) Mr. Smith replied that he would not be available that day and requested a date after June 21 instead. (*Id.* at 265.) The NRCS and Mr. Smith agreed to have the on-site delineation on June 23. (*Id.* at 266.) The on-site visit occurred as planned, and the NRCS Final Technical Determination and notice to Mr. Smith issued approximately a month later, on July 24, 2009. (*Id.* at 301.) The Final Technical Determination concluded that the Parcel was a Converted Wetland. (*Id.*) The NRCS notice stated:

> Portions of the wetland area delineated have been significantly altered since the date of the reconsideration site visit on November 11, 2008.[3] Because of these alterations, accurate delineation of the wetland was not possible. With the exception of some stumps from large trees that remain in the periphery of the wetland area, all woody vegetation within the wetland has been cleared and planted to a commodity crop. Additionally, there is evidence of the placement of fill in the north portion of the wetland, which has also been planted to a commodity crop . . . . Because the clearing of woody vegetation and placement of fill had the effect of making production of a commodity crop possible where it was not possible prior to such activities, the wetland is Converted Wetlands.

(*Id.*) The NRCS notice pointed out that mediation remained open for up to 60 days and that Mr. Smith could return to mediation or pursue an appeal. (*Id.*)

Also on July 24, 2009, the NRCS notified the FSA of the Final Technical Determination concerning the Parcel. (*Id.* at 307.) The FSA promptly informed Mr. Smith that the wetland conversion violated WC provisions and that therefore, Mr. Smith and his affiliates were now ineligible for all USDA benefits subject to the HEL and WC requirements. (*Id.* at 319.) In the same notice, the FSA pointed out that under the Food Security Act of 1985, as amended, "eligibility for benefits may be restored if a person is determined to have acted in good faith and without intent to violate and if that person agrees to a restoration or mitigation agreement that is approved by NRCS." (*Id.*) The FSA notice also described Mr. Smith's appeal rights.

C.  *The Appeals*

1.  NRCS Converted Wetland Determination

On August 27, 2009, Mr. Smith appealed the NRCS Final Technical Determination to the USDA's National Appeals Division (the "NAD"). At Mr. Smith's request, the NAD suspended the appeal while the mediation process continued. (*Id.* at 59-60, 74-75.) Ultimately, mediation failed,

---

[3]The report of the on-site reconsideration inspection indicates that inspection occurred on November 25, not November 11.

and the appeal proceeded.  (*Id.* at 84-85.)  Mr. Smith challenged both the Converted Wetland determination and the delineation of the Converted Wetland.  An in-person hearing before the NAD began on December 16, 2009, and concluded via telephone conference on January 7, 2010.  (*Id.* at 116.)  The Hearing Officer gave the parties an opportunity to supplement the record after the hearing, and he issued his decision on March 12, 2010.  (*Id.*)  The Hearing Officer made detailed factual findings based upon the evidence and arguments the parties presented.  (*Id.* at 117-21.)  Among other things, the Hearing Officer found that during its on-site visit of the Maple Drive Property on June 23, 2009, the NRCS "identified ten separate sites where observations of wetland indicators were documented . . . [and] noted on these sites that hydrophytic vegetation and hydric soils had been removed or buried and corn planted through these areas." (*Id.* at 119.)  The Hearing Officer found that Mr. Smith's retained wetland consulting firm conducted an independent delineation of the Maple Drive Property and found .94 acres of wetland, and that the consulting firm "noted that normal circumstances did not exist on the site . . . [and that] an atypical situation existed due to the disturbance or modification of the wetland environment due to agricultural activity." (*Id.*)  The Hearing Officer found that "[g]rowing season aerial photos of subject parcel for years 1979 through 2005 demonstrate a presence of standing water (inundation), a consistent presence of woody over-growth, and a distinct difference in the verdant nature of the wetland area to that of the surrounding crops and cropland." (*Id.*) And the Hearing Officer found that "[a] 2009 aerial photo demonstrates the site is inundated with water without the presence of the woody over-growth." (*Id.*)

The Hearing Officer also articulated why he was not persuaded that the NRCS erred in its Final Technical Determination that the Parcel was a Converted Wetland. (*Id.* at 121.) The Hearing Officer explained that the Parcel could not be considered Prior Converted Wetland, because the

record reflected that by December 23, 1985, all the conditions of a wetland were prevalent; that Mr. Smith's activities on the Parcel, regardless of the Mediation Agreement, demonstrate that the Parcel is Converted Wetland; and that because Mr. Smith did not request a minimal effect determination before converting the wetland, he was obliged to show to NRCS's satisfaction that the conversion had minimal effect, and he had failed to do so.  (*Id.*)

Mr. Smith appealed the Hearing Officer's decision, seeking a Director's Review.  (*Id.* at 128.)  After consideration of the evidence, arguments, and applicable regulations, the Deputy Director affirmed the Hearing Officer's decision. (*Id.* at 184-91.) He found that substantial evidence supported  both the Hearing Officer's findings of fact and his conclusion that the NRCS did not err in determining the Parcel is a Converted Wetland.  (*Id.*)  The Deputy Director observed that

> [Mr. Smith] had notice from the final technical determination that NRCS considered all of the area a manipulated wetland, and that there was a continuing dispute about the proper delineation of the extent of the wetland even after mediation.  In other words, [Mr. Smith] had admitted that he had a wetland; the only question was how extensive it was.  Although I accept that [Mr. Smith] believed that not all of the area was properly delineated as wetland, that he had the right to clear out a 45-year-old drainage system, and that the mediation agreement gave him permission to crop the land, [Mr. Smith] proceeded at his own risk when he removed woody vegetation, placed fill in an area considered a wetland and planted corn, thereby altering the land well beyond the condition NRCS had considered manipulated.

The Deputy Director found that Mr. Smith had not shown by a preponderance of the evidence that NRCS erred in determining that the entire Parcel was a Converted Wetland.  (*Id.* at 191.)  Nor was the Deputy Director persuaded by Mr. Smith and his expert's argument that the NRCS failed to conduct its determination in accordance with National Food and Security Act Manual.  (*Id.* at 192.) The NRCS Converted Wetland determination and delineation decision became final.

2.      FSA Ineligibility Determination

On August 27, 2009, Mr. Smith also appealed the FSA's determination that he and Maple
Drive were ineligible for USDA program benefits for 2009 and future years.  (FSA A.R. 162-65.)
The Hillsdale County Committee ("COC") notified Mr. Smith that he had to seek informal review
of the FSA determination before he could pursue an appeal with NAD.  (*Id.* at 166.)  The COC also
alerted Mr. Smith that it was unable to conduct the informal review as long as mediation of the
NRCS determination was pending.  (NRCS A.R. 262.)  The COC told Mr. Smith that the only
decision the COC had authority to make concerning the NRCS determination was whether to
recommend good faith relief.  (FSA A.R. 168.)  Eventually, on September 23, 2009, the COC
notified Mr. Smith that he remained ineligible for USDA program benefits because the NRCS final
technical determination of Converted Wetland remained in place.  (*Id.* at 5.)  The COC also
reminded Mr. Smith of his right to request a good faith determination that could restore his eligibility
for program benefits, contingent upon an acceptable mitigation plan.  (*Id.*)

Mr. Smith appealed to the NAD.  (*Id.* at 10, 23.)  The Hearing Officer conducted an in-person
hearing on December 16, 2009 and concluded the hearing via telephone on January 15, 2010.  (*Id.*
at 73-78.)  The Hearing Officer issued a decision on March 12, 2010, finding no error in the FSA's
determination that Mr. Smith was ineligible for USDA program benefits due to the wetland
violation. (*Id.*) Mr. Smith appealed, seeking a Director's Review.  (*Id.* at 83.) The Deputy Director's
decision issued on July 28, 2010.  (*Id.* at 101-05.)  The Deputy Director found that the COC erred
by failing to consider Mr. Smith's request for an ineligibility reduction under 7 C.F.R. § 12.4(c),
which the FSA interprets in Handbook 6-CP Paragraph 737B.  (*Id.*)  That provision allows the FSA
to reduce the penalty based on the seriousness of the violation as determined by the Deputy

9

Administrator for Farm Programs ("DAFP") and upon the recommendation of the COC.  (*Id.*)  NAD remanded Mr. Smith's request for an ineligibility reduction to the COC.

On remand, the COC initially rejected Mr. Smith's request for a reduced penalty.  (docket # 39-1, Supp. A.R., at 12-13.)[4]  Mr. Smith requested reconsideration, and the COC changed course. (*Id.*)  The COC contacted the Michigan State FSA Office to request that the DAFP provide relief to Mr. Smith.  (*Id.*)  The COC pointed out that Maple Drive had a high percentage of its farmland in the Conservation Reserve Program and that Maple Drive's conservation practices might deteriorate in the absence of CRP benefits.  (*Id.*)  The COC argued for allowing Maple Drive to participate in future conservation programs, in the interest of conservation itself.  (*Id.*)  The COC failed to convince the DAFP, who denied Mr. Smith's request for a reduction in penalty.  (*Id.* at 24-26.)  In his decision, the DAFP emphasized, among other things, Plaintiffs' refusal to mitigate.  (*Id.*)  On April 7, 2011, the FSA issued its final determination that Mr. Smith was ineligbile to receive USDA program benefits beginning in 2009 and continuing year-to-year unless satisfactory restoration or mitigation occurred.  (*Id.* at 27-29.)

## Standard of Review

Under 7 U.S.C. § 6999, courts review final determinations of the NAD in accordance with the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.* (the "APA").  The APA directs courts reviewing final agency decisions to "hold unlawful and set aside the agency action" if the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2)(A).  "Review under the arbitrary and capricious standard is deferential."  *Nat'l Ass'n*

---

[4]Plaintiffs proposed a Supplemental Administrative Record in docket #39.  At oral argument, Defendant consented on the record in open court to the proposed supplement.

*of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).  An agency decision is arbitrary and capricious if the agency

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of United States, Inc., v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Id.*  But "[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned."  *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004).

"A court reviewing an agency's adjudicative findings should accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole.*" Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992) (emphasis omitted).  An agency has "discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).  In reviewing an agency's interpretation of a statute the agency administers, a court must first consider "whether Congress has directly spoken to the precise question at issue."  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  If Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  If  Congress has not addressed the question at issue directly, and "the statute is silent or ambiguous with respect to the specific issue," then the court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  "If the agency's construction is a permissible one, even if it is not 'the reading the court

11

would have reached if the question initially had arisen in a judicial proceeding,' then the court must defer to the agency's interpretation." *Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (2008) (quoting *Chevron*, 467 U.S. at 843 n. 11). Similarly, "[w]hen interpreting an agency regulation, a court should also defer to the agency's interpretation of the regulation unless it is plainly erroneous or inconsistent with the regulation." *Id.*

## Discussion

A.      *Appeal of NRCS Converted Wetland Determination and Delineation*

1.      The Legal Standard

Maple Drive and Mr. Smith claim the NRCS erred as a matter of law by treating December 23, 1985, as the critical date on which to judge the wetland status of the property. They contend that the NRCS should have classified the Parcel as a Prior Converted Cropland under 16 U.S.C. § 3822(b)(2)(D), because portions of their farm land had originally been converted from wetland to arable, and returned to wetland status because the original drainage tiles deteriorated. According to Plaintiffs, the controlling issue is not whether the property was wetland on December 23, 1985, but whether the property had first been converted from wetland before that date, and then returned at any time – before or after the date – to wetland status. The Agency takes a different view and treats December 23, 1985, as a watershed date.

The statute provides that:

(D)      [a] wetland previously identified as a converted wetland (if the original conversion of the wetland was commenced before December 23, 1985), but that the Secretary determines returned to wetland status after that date as a result of –

   (i)      the lack of maintenance of drainage, dikes, levees, or similar structures;
   (ii)      a lack of management of the lands containing the wetland; or
   (iii)      circumstances beyond the control of the person.

12

16 U.S.C. § 3822(b)(2)(D).  The statute is open to multiple readings.  As one court has noted, "[t]he referent of "that date" could be December 23, 1985 . . . but it also could be the date on which the wetland was 'previously identified' or the date on which the 'original conversion . . . was commenced." *Horn Farms, Inc. v. Johanns*, 397 F.3d 472, 475 (7th Cir. 2005).  The Agency made a decision to identify the referent as a bright line date of "December 23, 1985," thus making the critical question for application of the exception whether the property was wetland on that date.  If it was, it cannot qualify for the exception in the Agency's view.  The implementing regulations express this interpretation, stating that:

> [p]rior converted cropland is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity has been produced at least once before December 23, 1985, **and as of December 23, 1985**, the converted wetland did not support woody vegetation and . . . . [i]nundation was less than 15 consecutive days during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more).

7 C.F.R. § 12.2(8) (emphasis added).  The Agency's interpretation is reasonable and entitled to *Chevron* deference.  *Horn Farms*, 397 F.3d at 476.  Accordingly, the controlling question is the wetland status of the property on December 23, 1985.

> 2.  The Factual Conclusion

The Agency concluded the property was wetland as of December 23, 1985.  There is nothing arbitrary or capricious in the Agency's conclusion on this record.  The record contains substantial evidence that the Parcel had returned to wetland conditions by the critical date.  In making its determination, the Agency considered the NRCS expert's opinion that growing season aerial photos of the Maple Drive Property covering the years 1979 through 1989 revealed wetland characteristics, including inundation, and woody vegetation different from crop vegetation in surrounding fields. (NRCS A.R. at 192.)  Based upon photographs of the Maple Drive Property covering the years 1979

13

through 2005, as well as expert testimony, the Hearing Officer found that the photographic evidence showed "a presence of standing water (inundation), a consistent presence of woody over-growth, and a distinct difference in the verdant nature of the wetland area to that of the surrounding crops and cropland." (NRCS A.R. at 119, 218-23.)  The Agency also considered a soil survey indicating the presence of hydric soils, and evidence of the extent and height of woody vegetation. (*Id.* at 121, 191-93.)  The NRCS conclusion was not arbitrary and capricious.  On the contrary, the record reflects a rational determination supported by ample evidence.

> 3.   The Delineation

Maple Drive and Mr. Smith also challenge the methodology and substance of NRCS's delineation decision.  Both the NRCS and Mr. Smith's own expert found that by June 23, 2009, the Parcel satisfied the conditions of an atypical situation for the purpose of completing the delineation. (*Id.* at 120-21, 192.) Such an atypical situation exists when recent human activities or natural events conceal wetland characteristics such as hydrophytic vegetation, hydric soils, and wetland hydrology. (*Id.* at 371-72.)  If an atypical situation exists, the NRCS applies procedures specified in Part IV, Section F of the COE Manual to ascertain whether there were indicators of wetland conditions before the events that caused the atypical situation occurred.  (*Id.* at 373-80.)  The record reflects that the NRCS did so by considering recent aerial photography, the pictures Mr. Wheeler took on November 4, 2008, vegetation and data sheets completed in 2008, and National Wetland Inventory maps.  (*Id.* at 191-93.)  The NRCS used this evidence to delineate the Parcel.

Plaintiffs claim that the NRCS improperly delineated the wetland to include the northern neck of the Parcel, which occupies a higher elevation than the southern part of the Parcel.  According to Plaintiffs, the NRCS did not evaluate the northern neck area properly.  This argument fails.  The

14

record includes the unchallenged 1988 and 1993 determinations that the Parcel area was a wetland, and both determinations encompassed the northern neck portion. (*Id.* at 213, 382.) The record also reflects that in making its determination and delineation decisions in 2008 and 2009, the NRCS considered soil samples taken during the on-site visit in November, 2008, including a soil sample from the northern neck area. (*Id.* at 192.) There is no dispute that the NRCS attempted to take another soil sample from the northern neck during the site visit on June 23, 2009, but that because the Plaintiffs had so altered the Parcel, the NRCS was unable to bore deep enough to reach the soil beneath the fill material and grass on the surface. The NRCS therefore used the methods it applies in atypical situations and concluded, based on substantial evidence, that the wetland included the entire Parcel. Plaintiffs have not shown that the NRCS's delineation determination was arbitrary and capricious.

      B.     *Appeal of FSA denial of program benefits.*

          1.       The "Minimal Effect" Exception

Plaintiffs object to the FSA's decision that they are ineligible for USDA program benefits because, according to Plaintiffs, they are entitled to an exception under 16 U.S.C. § 3822(f) for actions associated with conversion of a wetland if the action "will have a minimal effect on the functional hydrological and biological value of the wetlands in the area." Implementing regulations provide that "[i]f a person has converted a wetland and then seeks a determination that the effect of such conversion on wetland was minimal, the burden will be upon the person to demonstrate to the satisfaction of NRCS that the effect was minimal." 7 C.F.R. § 12.31(d). There is no dispute that Plaintiffs did not request a minimal effect determination before converting and planting the Parcel. Accordingly, Plaintiffs were obliged to demonstrate minimal effect to the satisfaction of NRCS. *Id.*

Plaintiffs have not carried their burden. The minimal effect determination section 31(d) described ties back to 7 C.F.R. § 12.5(b)(1)(v), which creates a pathway for a person to regain program benefits if NRCS "determines that such person is actively applying a conservation plan according to the schedule specified in the plan on all highly erodible land planted to an agricultural commodity or designated as conservation use." To qualify for a minimal effect exception, a person must also agree to a mitigation plan. Such a plan provides a way to create new wetland areas as a way of mitigating the impact of the lost wetland area. Plaintiffs cannot make their required showing on the minimal effect determination because they simply refuse to participate in any mitigation plan with NRCS even though they admit it would be feasible for them to present and participate in a mitigation plan. Under these circumstances, there is nothing arbitrary or capricious in NRCS's determination that Plaintiffs' conversion activities fall outside the minimal effect exception. Plaintiffs are not entitled to the benefit of the exception if they refuse to meet one of its requirements.

2.      The Penalty Reduction Issue

Plaintiffs also claim that the FSA acted arbitrarily and capriciously in denying the COC's recommendation for a penalty reduction under 7 C.F.R. § 12.4(c), which provides in part that ineligibility for all USDA program benefits due to a wetland violation "may be reduced, in lieu of the loss of all benefits . . . based on the seriousness of the violation, as determined by the FSA Deputy Administrator for Farm Programs or designee upon recommendation by the FSA County Committee." Section 12.4 (c) instructs the DAFP to consider

> [f]actors such as the information that was available to the affected person prior to the violation, previous land use patterns, the existence of previous wetland violations, the existence of previous wetland violations under this part or under other Federal, State, or local wetland provisions, the wetland values, acreage, and functions affected, the recovery time for full mitigation of the wetland values, acreage, and

16

functions, and the impact that a reduction in payments would have on the person's ability to repay a USDA farm loan.

The FSA interprets section 12.4(c) in its Handbook 6-CP, paragraph 737.  The Handbook at paragraph 737B instructs the DAFP in reviewing a request for penalty reduction to consider substantially similar factors:

> the affected person acted without the intent to violate the wetland conversion provisions; information that was available to the affected person before the violation; previous land use patterns; the existence of previous violations or other local, State or Federal wetland violations; the wetland functions and values affected; the recovery time for full mitigation of the wetland functions and values; the impact that a reduction in payments would have on the person's ability to repay USDA farm loans; whether there had been any previous wetland violations within the previous 5 years; and any other relevant factors.

In denying the COC recommendation, the DAFP cited both section 12.5 and Handbook Paragraph 737.  The DAFP explained that "[t]he submitted information shows that although Maple Drive Farms is aware of the need to restore or mitigate the converted wetland to regain eligibility for USDA benefits, it has no intention to do so and, in fact, Maple Drive Farms has expressed an intention to continue cropping the converted wetland."  (Supp. A.R. at 25.)  The DAFP added, "[c]learly, Maple Drive Farms is able to restore or mitigate the wetland, but is unwilling to do so. I, therefore, have determined that Maple Drive Farms, and its affiliated persons, will not have ineligibility reduced in this case."  (Supp. A.R. at 25-26.)

Plaintiffs argue that the DAFP erred in denying the COC's penalty reduction recommendation by applying the standards of 7 C.F.R. 12.5(a)(5)(C)(iv) instead of the standards section 12.4(c) delineates.  However, the DAFP did apply the Handbook paragraph that interprets section 12.4(c).  (*Id.* at 25.) Moreover, section 12.5(a)(5)(C)(iv), section 12.4(c), and the Handbook

17

at paragraph 737 all call for mitigation.  There is no dispute that Plaintiffs refuse to mitigate.  The DAFP decision was therefore neither arbitrary or capricious.

      C.    *Contract Claims*

Plaintiffs argue that even if they lose on the administrative review claims, they are still entitled to relief based on a breach of contract theory.  (Compl., docket # 1, at ¶¶ 76-85.)  They claim that the NRCS categorization of the Parcel as Converted Wetland, and the FSA's related denial of program benefits, breach the government's alleged contractual obligations under the original Conservation Plan and the Mediation Agreement.  To the extent Plaintiffs seek equitable relief in the form of specific enforcement of either agreement, sovereign immunity precludes the exercise of jurisdiction.  "Jurisdiction over any suit against the [United States] Government requires a clear statement from the United States waiving sovereign immunity . . . together with a claim falling within the terms of the waiver."  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003).  Plaintiffs have identified no waiver of sovereign immunity that would permit specific enforcement of the Conservation Plan or Mediation Agreement.  The Tucker Act does not authorize relief other than money damages for breach of contract claims against the federal government.  *Lee v. Thornton*, 420 U.S. 139, 854 (1975).  And courts have found repeatedly that the APA "does not waive sovereign immunity for claims that arise out of a contract and that seek specific performance of the contract as the relief."  *Robbins v. U.S. Bureau of Land Mgmt*, 438 F.3d 1074, 1082 (10th Cir. 2006) (citing *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F. 2d 598, 610 (D.C. Cir. 1992); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989); *Sea-Land Serv. Inc.*, 600 F.2d 429, 432-33 (3d Cir. 1979);

*Bowen v. Massachusetts*, 487 U.S. 879, 921 (1988) (Scalia, J., dissenting)).  Indeed, any other rule would create a huge end run to the carefully crafted standards of APA review.

That leaves Plaintiffs' claims for money damages of up to $10,000 per contract breached. Under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), subject to exceptions not applicable here, the district courts have original jurisdiction of  any "civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States."  Plaintiffs say they are voluntarily limiting their damages claims.  There is some authority to support jurisdiction under the Little Tucker Act when a plaintiff voluntarily limits damages.  *Smith v. Orr*, 855 F.2d 1544, 1553 (Fed. Cir. 1988); 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3657 (3d ed. 1998).  There is also authority that a plaintiff may bring multiple Tucker Act claims, each for less than $10,000, in a single action under the statute, and the amount of the claims will not be aggregated for jurisdictional amount purposes. *U.S. v. Louisville & N. R. Co.*, 221 F.2d 698,  702 (6th Cir. 1955); Wright, Miller & Cooper at § 3657.  Accordingly, the Court will assume it has jurisdiction over Plaintiffs' limited damages claims based on alleged breach of contracts.

Assuming there is jurisdiction in this Court, the Court sees no basis for contract relief for Plaintiffs.  Plaintiffs' contract claims are really nothing but a repackaged version of the administrative review claims.  The Agency properly exercised its powers, and Plaintiffs' claims under the APA failed.  Nothing in the original Conservation Plan or the Mediation Agreement purport to bind the agencies to abandon their regulatory judgment and decision-making process.  At most, the Conservation Agreement and Mediation Agreement memorialize specific and limited understandings about how the parties planned to proceed under programs then in place (the

Conservation Plan), or while engaged in one aspect of the administrative litigation process (the Mediation Agreement).   The Agency breaches nothing in these agreements when it lawfully exercises its regulatory and decision-making power, particularly when doing so under Congressional Acts that came after the Conservation Plan.

Even if the agencies had tried to contract away their regulatory aguthority, the Court would not enforce it.  The government regulates by statute and regulation, not by contract.  To the extent an agency or private party attempted to fashion a contract to preclude or limit the power of Congress or the Agency under the Swampbusters Act, the Court would find it unenforceable on public policy grounds.  *Cf. Singapore Dunes v. Saugatuck Twp.,* opinion and order at 9-10 (docket # 149 at Page ID ## 1849-50) Case No. 1:10-CV-210 (W.D. Mich. Nov. 1, 2011) (citing *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th Cir. 1994) ("Consent alone is insufficient to support a commitment by a public official that ties the hands of his successor."); *West v. Bank of Commerce & Trusts*, 167 F.2d 664, 667 (4th Cir. 1948) ("Indeed, the City Council itself had no power in 1927 to bind successive Councils in the exercise of the power conferred upon them by the city charter."); *cf. Nat'l Revenue Corp. v. Violet*, 807 F.2d 285, 288 (1st Cir. 1986) (holding consent judgment 'void on its face' where attorney general's office agreed that statute was invalid.))  "[D]emocracy does not permit public officials to bind the polity forever . . . . [T]emporary officeholders may not contract away the basic powers of government to enact laws . . . . in the same way natural persons may make enduring promises about their own future behavior."  *Evans*, 10 F.3d at 478.

Accordingly, to the extent Plaintiffs seek injunctive relief based upon their breach of contract theory, the Court dismisses the claim for lack of jurisdiction. To the extent the Court may exercise

20

jurisdiction over the Plaintiffs' contract claims for damages under the Little Tucker Act, the Court rejects those claims on the merits.

### Conclusion

Ironically, Plaintiffs themselves hold the key to restoration of the benefits they seek. Plaintiffs' own refusal to engage in wetland mitigation is the root cause of their trouble. Plaintiffs have acknowledged throughout the process that there is no feasibility problem preventing them from mitigating. They simply do not want to mitigate. They disagree with the policy judgments of Congress and the Agency. That is Plaintiffs' prerogative, but if they would like the benefit of government programs, they must abide by the government's rules, whether they agree with them or not. There is nothing unfair or extortionate about that. All citizens have the burden, on occasion, of having to honor government rules with which they disagree. The fundamental premise of our polity, though, is that we will all live by the rules duly adopted by those with power to do so even – maybe even especially – when we disagree with them. The dissenters' remedy is to work for changes in the rules at the relevant level – here, Congress and the Agency. At least the Plaintiffs here can pave their own way to receiving benefits once they accept the rules they don't like but that apply to everyone. Unless and until they do, there is nothing arbitrary, capricious, or otherwise unlawful in the Agency's determinations at issue in this case.


Dated:      December 13, 2012            /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       UNITED STATES DISTRICT JUDGE